**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ARCH INSURANCE COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 07 C 5060 |
| ) | |
| R.A. BRIGHT CONSTRUCTION, INC., ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendant. ) | |
| _____ ) | |
| R.A. BRIGHT CONSTRUCTION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 07 C 6026 |
| ) | |
| ARCH INSURANCE COMPANY, ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Between 2003 and 2005, Arch Insurance Company and R.A. Bright Construction Company, Inc. entered into three year-long, loss-sensitive "Workers Compensation and Employers Liability Insurance" policies (the "Policies"), under which Arch agreed to provide insurance coverage for workers' compensation and employers' liability claims against Bright. In connection with the Policies, Arch and Bright executed a series of separate "Incurred Loss Sensitive Program Agreements" (the "ILSPAs") intended to "describe certain parts of the Program that the Insured and Arch have entered into and set forth certain of the duties and obligations of each party with respect to the Program." (ILSPAs, Exs. A, B, C to Arch Memorandum of Law [Dkt. 41]). By their terms, the ILSPAs superseded any other loss sensitive endorsements to the original Policies. In addition, each ILSPA contained a choice of law provision stating that the "Agreement" would be governed by and interpreted in accordance with New York law.

In September 2007, Arch sued Bright for failure to pay insurance premiums owed under the

Policies. Bright denied owing Arch the amounts alleged and countersued Arch for mishandling workers' compensation claims against Bright.[1] Bright also asserted six affirmative defenses to Arch's complaint, including a first affirmative defense for setoff based on Arch's breach of contract. Arch moved to dismiss Bright's claim and strike its first affirmative defense. In a reply memorandum in support of that motion, Arch argued for the first time that New York law governed the parties' dispute based on the ILSPAs' choice of law provision. After allowing Bright the opportunity to respond to this new argument, the court reviewed the plain language of the Policies and the ILSPAs and concluded that the parties intended the ILSPAs as a supplement to the original Policies. The court concluded, further, that the ILSPAs' terms were central to the interpretation of the Policies and to Bright's claim. Because New York law does not recognize an action for breach of the implied duty of good faith and fair dealing, the court granted Arch's amended motion to dismiss Bright's counterclaim. Bright has again asserted its breach of contract claim against Arch, and Arch has again moved to dismiss it. For the reasons set forth below, the court now concludes that Bright's claim is not barred by the choice-of-law provision in the ILSPAs and denies the motion.

## DISCUSSION

**Bright's Second Amended Complaint**

In its Second Amended Complaint, Bright again asserts that Arch breached its implied duty of good faith and fair dealing in "handling investigating, defending, settling, and paying of claims against R.A. Bright under the Loss Sensitive Policies." (Second Amended Compl. ¶ 65; *compare* Amended Compl. ¶ 14.) Bright makes these allegations in three separate counts: In Count I, Bright alleges that Arch breached the implied duty of good faith and fair dealing under Illinois law, and identifies the following factual bases for this claim: Arch's failure to adequately investigate claims

---

[1] Bright's claims against Arch were filed in a separate complaint, in Case No. 07 C 6026, which was reassigned to this court as related to Arch's lawsuit for recovery of unpaid premiums.

2

against Bright, its failure to use accurate wage information in calculating benefits and average weekly wages, its failure to maintain complete and accurate records, and its failure to comply with its own guidelines and policies in handling claims. (Second Amended Compl. ¶ 67.) Count II of the Second Amended Complaint seeks a declaratory judgment establishing that the Loss Sensitive Policies alone govern Bright's contract claims, that the ILSPAs do not govern the parties' rights and obligations under those Policies, and that the New York choice-of-law provision does not govern those Policies. (Pl. Mem. in Support of Its Mot. to Dismiss [Dkt. 41].) In Count III, Bright alleges that if New York law applies, the court should interpret New York law as recognizing a claim against Arch for breach of contract under Bright's theory.

**The Law of the Case Doctrine Does Not Bar Reconsideration of the Choice-of-Law Issue**

Arch contends that Bright's Second Amended Complaint is no more than a thinly-veiled attempt to get "a second bite at the apple" regarding the applicability of the ILSPAs' New York choice of law provision to this dispute. Bright's current arguments, Arch contends, were "expressly or implicitly rejected" when the court granted Arch's earlier motion to dismiss, and the renewed motion should therefore be granted under the doctrine of "law of the case."

Arch's reliance on this doctrine is misplaced. The court is free to revisit its earlier conclusion under even the most rigid understanding of the doctrine. As this court has written elsewhere, the law-of-the-case doctrine is "no more than a presumption, one whose strength varies with the circumstances; it is not a straitjacket." *In re Spiegel, Inc. Securities Litigation*, No. 02 C 8946, 2005 WL 1838449, at *7 (N.D. Ill. July 29, 2005) (quoting *Alston v. King,* 157 F.3d 1113, 1116 (7th Cir. 1998)); *see also Tice v. Am. Airlines, Inc.*, 373 F.3d 851, 853 (7th Cir. 2004) (the doctrine is not "hard and fast, and so a party is free to argue that an intervening change in law or other changed or special circumstance warrants a departure"). "Pre-judgment orders, such as motions to dismiss, are interlocutory and may be reconsidered at any time" before the entry of judgment or resolution on appeal. *In re Spiegel*, 2005 WL 1838449, at *7 (quoting *Cameo Convalescent Ctr., Inc. v. Percy*,

800 F.2d 108, 110 (7th Cir.1986)).  Despite Arch's protestations that the doctrine of law of the case *should* apply, none of the authority Arch cites holds that the doctrine *must* bar a court from altering its own ruling in the course of the same litigation.  *See In re Soybean Futures Litigation*, 892 F. Supp. 1025, 1042 (7th Cir. 1995) ("In matters involving interlocutory orders, such as motions to dismiss, or matters that have not been taken to judgment or determined on appeal, the Seventh Circuit has made clear that the district courts have the discretion to reconsider their decisions at any time.")  Further, as Arch itself acknowledges, a court has a duty to correct a plain error in judgment.  *See Pickett v. Prince*, 207 F.3d 402, 407 (7th Cir. 2000) ("[A] judge's refusal to correct a plain error that he had committed weeks before is not justified by the doctrine of the law of the case, or anything else we can think of.")  The court is thus free to consider Bright's argument that the ILSPAs do not apply to its claims against Arch.

**The ILSPAs Are Not Directly Relevant to Bright's Claims**

Bright alleges that Arch failed to act reasonably in handling workers' compensation claims against Bright, thereby violating its duties under the Policies and causing Bright to experience greater losses than it would have, had Arch handled the claims properly.  Because the Policies are "loss sensitive," these greater losses resulted in higher premiums for Bright.  Bright does not contend that Arch calculated the premiums improperly or that Arch's methodology in determining the premiums was fraudulent or unsound.  Rather, Bright complains only that Arch breached its duty under the policies to investigate, defend, settle and pay out claims in a reasonable manner.  In assessing this argument, the court has taken a closer look at the documents that comprise the Policies, including the ILSPAs.

**The Policies**

It is undisputed that the policies at issue are "loss sensitive."  Put simply, a loss sensitive policy's premiums vary depending on actual losses the insured incurs over the course of the policy's term.  Loss sensitive policies come in one of two forms: "retrospectively rated" policies and

4

"large deductible" policies. A "retrospectively rated" policy calculates the annual premium based on the insured's actual losses over the course of the term. A "large deductible" policy requires the insured to reimburse the insurer for payments made in the form of benefits, damages, and expenses associated with defending and settling claims against the insured over the course of the policy's term, up to a deductible cap. Losses exceeding the deductible are covered by the insurer up to the policy's prescribed limit. In addition to paying all losses under the deductible, the insured must also pay a reduced "deductible premium," which is estimated at the beginning of the policy term and finalized based on an end-of-term audit by the insurer. *See* Margaret M. Anderson, Courtney E. Barr, & Kara J. Bruce, *The Creditor Is Always There: The Insurance Company*, 17 NORTON J. OF BANKR. L. AND PRACTICE 4 (2008).

The Policies between Arch and Bright employ the "large deductible" model: Bright's standard annual premium was based on an end-of-term payroll audit using a formula that begins with Bright's payroll, takes account of certain employee classification rates (assigned by Arch in accordance with its internal guidelines), and then is adjusted upwards or downwards on the basis of Bright's "experience modification factor." (Second Amended Compl. ¶ 59.) The "experience modification factor" "reflects a comparison between actual losses and expected losses," using a formula developed by the National Council of Compensation Insurance, Inc. (*Id.* ¶ 60.) The losses experienced in one policy year thus affect the experience modification factor and, consequently, influence the standard premium for policies issued in subsequent years, with greater losses resulting in a higher premium and lower losses in a reduced premium. (*Id.* ¶ 61.)

The parties dispute the role that the ILSPAs play in Bright's claims. Putting the ILSPAs aside for the moment, it is apparent that the three Policies consist of several other interrelated documents. (Policies, Exs. A, B, C to Second Amended Compl. [Dkt. 23].) First, there is Arch's standard Workers Compensation and Employer Liability Insurance Policy (hereinafter the "standard policy"), which is divided into a General Section and Parts One through Six. The General Section

briefly summarizes the standard policy's purpose, and identifies the parties, relevants statutes, and geographical scope. Parts One through Four describe the parties' obligations and liabilities under the Policies, including specific duties assigned to Arch in handling claims against Bright. "Part One: Workers Compensation Insurance" imposes on Arch a duty to "defend at [Arch's] expense any claim, proceeding or suit against [the insured] for benefits payable by this insurance." "Part Two: Employers Liability Insurance" imposes on Arch a duty to "to pay all sums [the insured] legally must pay as damages because of bodily injury to [the insured's] employees," provided the injury is covered under the standard policy. Part Two also gives Arch the "right and duty to defend, at [Arch's] expense, any claim, proceeding or suit against [the insured] for damages payable by this insurance." "Part Three: Other States Insurance" describes how the Policy applies when the insured's employees perform work in a state other than Illinois. Part Four summarizes Bright's duty under the Policies in the event of injury to a worker. Part Five summarizes the calculation and determination of premiums under the standard policy, including a provision that the "final premium will be determined after this policy ends by using the actual, not the estimated premium basis . . . ." Finally, Part Six describes certain miscellaneous conditions involving prohibitions on transfer, cancellation, and Arch's right to inspect the insured's workplace.

In addition to these provisions, each of the three Policies also includes an "Information Page," specifically mentioned in the standard policy's General Section. The Information Page identifies the insurer, the insured, and the term of the policy, provides a brief description of the policy, and sets forth an estimated annual premium. (Policies: Information Page, Exs. A, B, C to Second Amended Compl.) The first Policy's coverage period ran from July 1, 2003 through July 1, 2004, the second from July 1, 2004 through July 1, 2005, and the third from July 15, 2005 through July 1, 2006. Item three of the Information Page for each of the three Policies states that the Workers' Compensation Insurance, described in Part One of the standard policy, applies to the Workers Compensation Law of Illinois and that the Employers Liability Insurance, described in Part

Two of the standard policy, applies to work in the State of Illinois. Item three also lists the maximum limit of the insurer's liability under Part Two for employee injuries due to accident or disease and, additionally, identifies other states where the policy will apply if the insured is not already covered by other insurance in that state. Finally, item three refers to a separate Schedule of Forms and Endorsements as being included in the policy. Item four of the Information Page states the following about the calculation of the premium:

> The premium for this policy will be determined by our Manuals of Rules, Classifications, Rates and Rating Plans. All information required below is subject to verification and change by audit.

Beneath this statement, each Information Page refers the reader to the Workers Compensation Classification Schedule for the calculation of the annual premium and then lists the total estimated annual premium, the minimum premium, and a figure called the "Expense Constant."

As briefly described earlier, the "loss sensitive" nature of the Policies derives from the terms of the "Deductible Endorsement," one of several endorsements attached to and incorporated into the Policies. (Policies: Deductible Endorsement, Exs. A, B, C to Second Amended Compl.) Under the 2003-2004 policy, Bright's deductible was $200,000 for "each accident for benefits or damages because of bodily injury by accident," or $200,000 for "each employee for benefits or damages because of bodily injury by disease." The deductible remained at $200,000 per accident or employee for the 2004-2005 policy, but rose to $250,000 per accident or employee for the 2005-2006 policy. In addition, each Deductible Endorsement describes Bright's obligation to pay "allocated loss adjustment expenses" on any claim Arch defends, the insured's obligation to pay certain fees associated with unallocated loss adjustment expenses, and Arch's right to require collateral to secure deductible amounts under the Deductible Endorsement. (Exs. A, B, C to Second Amended Compl.) The endorsement defines "allocated loss adjustment expenses" (hereinafter "ALAE") as follows:

> "Allocated Loss Adjustment Expenses" shall mean such claim adjustment expenses

> directly allocated by us to a particular claim. Such expense shall include, but shall not be limited to, attorney's fees for claims in suit, court and other specific items of expense, such as medical examination, expert medical or other testimony, medical cost containment expenses, laboratory and x-ray autopsy, stenographic, witnesses and summons, and copies of documents, but does not included Unallocated Loss Adjustment Expenses.

The endorsement defines "Unallocated Loss Adjustment Expenses" (hereinafter "ULAE") as "the cost of investigation, adjustment, settlement or defense of any claim or suit by our salaried employees or independent adjusters." The "Schedule" section of the Deductible Endorsement states that the endorsement applies in the State of Illinois.

**The ILSPAs**

Nothing in the standard policies, Information Pages, or the attached schedules or endorsements makes any reference to an "Incurred Loss Sensitive Program Agreement." It is undisputed, however, that the parties did enter into "Incurred Loss Sensitive Program Agreements" corresponding to each of the three Policies. (*See* ILSPAs, Exs. A, B, C to Arch Memorandum of Law [Dkt. 41].) Each ILSPA states that its purpose is "to describe certain parts of the [insurance] Program that the Insured and Arch have entered into and set forth certain of the duties and obligations of each party with respect to the program." Each ILSPA also contains language describing the "Scope of the Agreement" as follows:

1. This Agreement applies to:

    (i) The Applicable Policies as described in paragraph 2 of the Specifications;
    (ii) The Coverage Part(s) of the Applicable Policies as described in paragraph 2 of the Specifications;
    (iii) All subsequent endorsements, extensions and/or rewrites of the Applicable Policies;
    (iv) Any Collateral (as defined below) demanded of the Insured, whether received or not; and

2. This Agreement supersedes any Loss Sensitive Endorsements to the Applicable Policies and any prior oral or written communications and negotiations between the Insured and Arch.

(*See, e.g.*, Ex. A to Arch Memorandum of Law [Dkt. 41]). The "Applicable Policies" are identified

as the Policy for the most recent coverage period, and the "effective" date of each ILSPA corresponds to the effective date of that Policy. Thus, the ILSPA "effective July 1, 2003" applies to the Policy with an effective date of July 1, 2003. The ILSPAs define "Loss Sensitive Endorsements" as including "deductibles, Self Insured Retention (SIR), retrospective premium endorsements, and any other endorsement whose value is a direct function of the losses incurred, that are attached to the Applicable Policies." Further, each ILSPA contains a schedule listing Bright's "fixed cost premium," "loss exposure," required collateral, and other loss-based charges due under the Policies.

Bright contends that the Policies and their endorsements establish the "insurer-insured" relationship, including "Arch's basic obligations and Bright's obligations of reimbursement and premium," independent of the ILSPAs. (Bright Response at 6.) Moreover, Bright argues, the Policies qualify as "loss sensitive" independent of the ILPSAs. The court agrees with Bright that each Policy, including its endorsements, is "loss sensitive" on its face. It is also clear to the court, however, that the ILSPAs were intended to apply to the three Policies and to displace theDeductible Endorsements. The Policies were "loss sensitive" even without reference to the ILSPAs, but the ILPSAs explicitly superseded the Policies' "loss sensitive" terms. The ILSPAs were unquestionably intended to modify the original Policies and thus must be read together with the Policies.

The court thus returns to the question of whether the ILSPAs' choice-of-law provision necessarily governs Bright's claims against Arch. The court earlier concluded that the New York choice-of-law provision that appears in the ILSPAs applies to the policies as a whole, but having examined the documents again in detail, the court is no longer comfortable with that conclusion. The specific language in each of the ISLPAs reads as follows: "This Agreement will be governed by and interpreted in accordance with the laws of the State of New York without regard to New York's rules on conflicts of law." (*See* ILPSAs, Exs. A, B, C to Arch Memorandum [Dkt. 41].) As Bright notes, this provision on its face refers only to "[t]his Agreement," that is, to the ILSPA alone.

9

(Def. Resp. [Dkt. 68] at 10.) The ILSPAs may have superseded the Policies' "Loss Sensitive Endorsements," but they do not purport to displace any other parts of the Policies. The ILSPA language does not suggest that anything beyond the ILSPA itself is to be governed by New York law, nor do the Policies make any reference to New York law. Instead, though the Information Page of each Policy explains that the workers' compensation and employers liability coverage relates to the workers compensation law of Illinois and to work performed in Illinois, the Policies themselves do not include any choice-of-law provision. (*See* Policies: Information Page, Exs. A, B, C to Second Amended Compl.)

The court recognizes, further, that nothing on the face of Bright's claims relies upon the terms of the ILSPAs. The primary purpose of the ILSPA documents is to outline the calculation and payment of premiums and other fees under the Policies and to state Bright's obligations regarding those payments. Each ILSPA contains information similar to that contained in each Policy's Information Page and Deductible Endorsement, including information regarding premiums, loss exposure, required collateral, additional loss-based charges, invoices, and audits. And, as noted, the ILSPAs explicitly supersede the terms set forth in that earlier Endorsement. Crucially, nothing in the ILSPAs refers to any duties or obligations of the parties with respect to the handling of workers' compensation claims. Those duties are instead described almost exclusively in Parts One through Four of Arch's standard policy. Bright's claims deal with Arch's duty under the Policies to handle workers' compensations claims against Bright in a reasonable manner designed to minimize Bright's losses and the resulting premium. Bright's Second Amended Complaint does not allege any breach of duties or obligations owed under the ILSPAs, nor does it appear to implicate any of the ILSPAs' other provisions. Nothing in the ILSPAs' terms appears relevant to Bright's claims, nor can the court discern any other rationale for application of the ILSPAs' choice-of-law provision to bar Bright's claim. Tellingly, Arch has failed to offer a serviceable argument to the contrary, other than to say the court got it right the first time and should not second-guess its original judgment.

**Illinois Law Recognizes a Cause of Action for Bright's Claim**

Having concluded that neither the ILSPAs nor their choice-of-law provision applies to the parties' dispute, the court must determine which jurisdiction's law does apply and whether Bright has stated a cause of action under that law. A federal court sitting in diversity looks to conflict-of-law rules in the jurisdiction in which it sits to determine the substantive law applicable to the case. *GATX Leasing Corp. v. Nat. Union Fire Ins. Co.*, 64 F.3d 1112, 1115 (7th Cir. 1995). Illinois courts follow the "most significant contacts" approach in determining the proper choice of law. *Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1122 (7th Cir. 1998). Under that approach:

> "[I]nsurance contract provisions may be governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a relationship to the general contract." *While all these factors must be considered in the choice of law analysis, the location of the insured risk is given special emphasis . . . . [T]he "location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally in a single state."*

*Id.* (quoting *Soc'y of Mount Carmel v. Nat. Ben Franklin Ins. Co. of Ill.*, 268 Ill. App. 3d 655, 643 N.E.2d 1280, 1286 (1st Dist. 1994)) (citations omitted) (emphasis in original). The *Massachusetts Bay* court was addressing a car insurance policy, but the same principles apply to workers compensation insurance. *See Socy' of Mount Carmel*, 268 Ill. App. 3d at 680, 643 N.E.2d at 1286; RESTATEMENT (SECOND) CONFLICT OF LAWS § 193, cmt. a.

In this case, the insured risk is located within Illinois: As alleged in the complaint, Bright and all of its employees are located in Illinois, and the Policies were intended as insurance against injury to those employees. Moreover, each Policy's Information Page explicitly states that "the policy applies to the Workers Compensation Law of Illinois." (Exs. A, B, C to Second Amended Compl.) As Bright notes, before Arch discovered the choice-of-law provision in the ILSPAs, it too assumed the applicability of Illinois law in its memorandum in support of its first motion to dismiss. (Def. Resp. at 4.) The court therefore concludes Illinois law governs this action.

Unlike the State of New York, Illinois has long recognized a cause of action for breach of an insurer's duty to exercise good faith and fair dealing in executing its obligations under a loss sensitive insurance contract. *See Zurich Ins. Co. v. T.T.C., Inc.*, No. 92 C 6051, 1994 WL 66086, at *3 (N.D. Ill. Mar. 3, 1994) ("When an insurance policy with a retrospective premium is involved, a cause of action is stated when the insured alleges that the insurer breached its duty by settling claims in an unreasonable manner."); *Nat. Sur. Corp. v. Fast Motor Serv. Inc.*, 213 Ill. App. 3d 500, 506, 572 N.E.2d 1082, 1087 (1st Dist. 1991) (recognizing cause of action for "breach of an insurer's duty of good faith based on the insurer's failure to act reasonably when adjusting claims under a policy of insurance which contains a retrospective premium feature . . . .") Indeed, this very court, relying on *National Surety*, has acknowledged Illinois' recognition of such a claim. *See U.S. Fire Protection Ill., Inc. v. St. Paul Fire and Marine Ins. Co.*, No. 02 C 7462, 2004 WL 2644407 at *16 (N.D. Ill. Nov. 19, 2004) (Pallmeyer, J.) (citing *Nat. Sur. Corp.*, 213 Ill. App. at 506, 572 N.E.2d at 1087). As the *Zurich* court explained, when the insurer breaches its duty to act in good faith in settling claims under a retrospective premium policy, the insured states a claim where it alleges to have paid premiums "in excess of the amount which would have been due had the claims been properly handled." *Zurich*, 1994 WL 66086, at *3.

In its Second Amended complaint, Bright levels a claim against Arch nearly identical to that in *Zurich*. Like the plaintiff in *Zurich*, Bright claims that Arch breached its duty to handle workers' compensation claims in a reasonable manner and that, as a result, Bright was charged with "improperly, excessively, and unreasonably inflated loss-based premiums adjustments." (Second Amended Compl. at 17.) *See id.* Moreover, Bright's complaint alleges detailed facts describing Arch's breach of that duty—facts that, if proven, could support a verdict in Bright's favor under Illinois law. The court therefore finds that Bright has stated a cause of action under Illinois law for breach of Bright's implied duty of good faith and fair dealing under the Policies.

**Bright's Remaining Claims**

Because Illinois law applies to this dispute and recognizes a cause of action under Count I of Bright's Second Amended Complaint, the court need not address the two remaining counts in Bright's complaint. Count II seeks a declaratory judgment that the ILSPAs are invalid and unenforceable or else void as against Illinois public policy, and Count III argues that the court should recognize Bright's claim even under New York law. To the extent that Plaintiff's challenge in Count II is limited to the New York choice-of-law provision, that Count, as well as Count III, will be dismissed as moot.

Finally, Arch has moved to strike all of Bright's affirmative defenses. With the exception of the defenses of setoff under New York and Illinois law, however, Arch has not articulated a legal basis for their dismissal. Having held that Illinois law applies to this dispute, the court denies the motion to strike Bright's First Amended Affirmative Defense but strikes the Second Amended Affirmative Defense as moot. Because Arch has not raised any argument as to the remaining five affirmative defenses, the court denies Arch's Motion to Dismiss with respect to those defenses.

**CONCLUSION**

Count I of Bright's Second Amended Complaint states a valid claim for relief under Illinois law . Arch's motion to dismiss and strike (62) is denied, but Bright's second affirmative defense is stricken without prejudice.

ENTER:

Dated: May 28, 2009

_____
REBECCA R. PALLMEYER
United States District Judge